UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| vs. ) | No. 1:19-cr-00378-JMS-MJD |
| ) | |
| WILLIAM ERIC MEEK and ) | |
| BOBBY LEE PEAVLER, ) | |
| ) | |
| *Defendants*. ) | |

**ORDER**

Defendants William Eric Meek and Bobby Lee Peavler were indicted on twelve Counts related to their activities while employed by Celadon Group, Inc. ("Celadon"), a publicly traded trucking company headquartered in Indianapolis, Indiana. [Filing No. 32.] Mr. Peavler has filed a Motion for a Bill of Particulars and To Strike the Phrase "Among Other Things" As Surplusage. [Filing No. 35.] In his motion, Mr. Peavler requests that the Court order the Government to file a bill of particulars that discloses "(i) the names of unindicted co-conspirators; and (ii) the alleged false or misleading statements alleged to be at issue in the substantive charges of the Indictment." [Filing No. 34 at 1.] He also requests that the Court "strike the phrase 'among other things' from Counts 5 and 12 as surplusage and strike the same phrase as it is incorporated by the Indictment into the charges in Counts 7 and 8." [Filing No. 34 at 1.] Mr. Meek has moved to join in the requests for relief sought in Mr. Peavler's Motion. [Filing No. 39.]

**I.
BACKGROUND**

A grand jury returned an Indictment charging Mr. Meek and Mr. Peavler with twelve Counts. [Filing No. 32.] The Indictment alleges that Mr. Meek was President and Chief Operating

1

Celadon and that Mr. Peavler was Celadon's Chief Financial Officer. [Filing No. 32 at 1-2.] It also alleges that Danny Ray Williams[1] was the President of Celadon's Quality division.[2] [Filing No. 1 at 2.] The Indictment states that "[f]rom in or around at least June 2016, through in or around at least April 2017," Mr. Meek, Mr. Peavler, Mr. Williams, and others at Celadon agreed to:

> (a) defraud Celadon's shareholders, banks, and the investing public; (b) falsify Celadon's accounting records in order to hide losses incurred by [Celadon]; (c) conceal from shareholders, banks, and the investing public that Celadon was in violation of at least one bank covenant governing its lending arrangements; and (d) mislead Celadon's independent auditors and regulators, including individuals at Accounting Firm 1.

[Filing No. 32 at 6.][3] More specifically, the Indictment alleges that Celadon owned more than 11,000 trucks, but that the value of many of those trucks had dropped because of a decrease in the used truck market. [Filing No. 32 at 7.] Additionally, many of the trucks had a significant mechanical issue that further reduced the trucks' values. [Filing No. 32 at 7.] However, Defendants and their co-conspirators[4] did not account for the trucks' reduction in value on Celadon's accounting records. Instead, Defendants and their co-conspirators engaged in a series of transactions with Truck Dealer 1 in which "Celadon's Quality division trad[ed] away hundreds of its older and less desirable trucks . . . to Truck Dealer 1 in exchange for used (but generally newer) trucks owned by Truck Dealer 1." [Filing No. 32 at 8.] However, "Celadon and Truck

---

[1] Mr. Williams is not a defendant in this case.

[2] The Indictment also frequently refers to "Executive 1," who was Celadon's Chief Executive Officer and "served as the highest-ranking executive within Celadon and for signing and certifying Celadon's financial statements released to the investing public." [Filing No. 32 at 2.]

[3] Accounting Firm 1 "acted as the independent auditor of Celadon's financial statements." [Filing No. 32 at 4.]

[4] The Indictment frequently alleges that "Meek, Peavler, Williams and their co-conspirators" engaged in various conduct. [*See* Filing No. 32.] However, the Indictment does not name any additional individuals or otherwise identify the Defendants' unnamed co-conspirators.

Dealer 1 inflated the prices on both sides of the trade by approximately the same amount, allowing Celadon to dispose of the trucks while hiding its losses." [Filing No. 32 at 9.] The Indictment also alleges that on a separate occasion, Defendants and their co-conspirators organized a set of staggered transactions in which Truck Dealer 1 sent several millions of dollars to Celadon prior to September 30, 2016 (the close of the third fiscal quarter) with a "secret and unreported agreement that Celadon would pay a similar amount of money back to Truck Dealer 1 shortly after [September 30, 2016]," so that Celadon could pay down its debt to its banks before the close of the financial quarter and conceal its true financial status. [Filing No. 32 at 11-12.] The Indictment alleges that the purpose of the scheme was for Mr. Meek, Mr. Peavler, Mr. Williams, and their co-conspirators to: "(a) conceal Celadon's true financial condition from Celadon's shareholders, banks, the investing public, independent auditors, and regulators; and (b) unjustly enrich themselves through their continued receipt of compensation and other benefits." [Filing No. 32 at 6.]

Count 1 of the Indictment charges Defendants with conspiracy to commit wire fraud, bank fraud, and securities fraud in violation of 18 U.S.C. § 1349. [Filing No. 32 at 18.] Counts 2 through 6 charge Defendants with wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2. [Filing No. 32 at 20.] Counts 7 and 8 charge Defendants with securities fraud in violation of 18 U.S.C. § 1348 and 18 U.S.C. § 2. [Filing No. 32 at 22.] Count 9 charges Defendants with conspiracy to make false statements to a public company's accountants and to falsify books, records, and accounts of a public company in violation of 18 U.S.C. § 371. [Filing No. 32 at 23.] Counts 10 and 11 charge Mr. Peavler, and Count 12 charges both Defendants, with making false statements to a public company's accountants in violation of 15 U.S.C. § 78ff; 17 C.F.R. §§ 240.13b2-2(a), (b); and 18 U.S.C. § 2. [Filing No. 32 at 26.]

## II.
## STANDARD OF REVIEW

**A. Bill of Particulars**

Federal Rule of Criminal Procedure 7(f) allows the Court to "direct the government to file a bill of particulars." The choice to grant or deny a motion for a bill of particulars "is committed to the discretion of the trial court." *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003). The purpose of a bill of particulars is to inform the defendant of the nature of the charges brought against him or her, allow the defendant to adequately prepare his or her defense, avoid unfair surprise during the trial, and protect against the risk of a second prosecution for an inadequately described offense. 41 Am. Jur. 2d Indictments and Informations § 142 (2020). *See also United States v. Caputo*, 288 F. Supp. 2d 923, 925 (N.D. Ill. 2003). In considering a motion for a bill of particulars, "the key question is whether the defendant[s] were sufficiently apprised of the charges against them in order to enable adequate trial preparation." *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) (citing *Fassnacht*, 332 F.3d at 446). In making that determination, courts in this Circuit have considered "the charges' complexity, the indictment's clarity, and the availability of discovery to determine if the requested information is needed to sufficiently apprise Defendants of the charges against them to enable them to prepare for trial." *Caputo*, 288 F. Supp. 2d at 925.

However, "a bill of particulars is 'unnecessary where the indictment sets forth the elements of the charged offenses,'" *United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2013) (quoting *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003)), or where the information "is available through 'some other satisfactory form,' such as discovery," *Blanchard*, 542 F.3d at 1140 (quoting *Hernandez*, 330 F.3d at 975). A "defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved," *United States v.*

4

*Kendall*, 665 F.2d 126, 135 (7th Cir. 1981) (quoting *United States v. Giese*, 597 F.2d 1170, 1181 (9th Cir. 1979)), and "a defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case," *Kendall*, 665 F.2d at 135. An indictment that sets forth "each of the elements of the charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the applicable statute or statutes" is sufficient. *Vaughn*, 722 F.3d at 927 (citing *Fassnacht*, 332 F.3d at 446).

### B. Request to Strike "Among Other Things"

Under Federal Rule of Criminal Procedure 7(d), the Court may strike surplusage from the indictment "if the court finds the language to be immaterial, irrelevant, or prejudicial." *United States v. Marshall*, 985 F.2d 901, 905 (7th Cir. 1993). "The inclusion of clearly unnecessary language in an indictment that could serve only to inflame the jury, confuse the issues, and blur the elements necessary for conviction under the separate counts involved surely can be prejudicial." *United States v. Climatemp, Inc.*, 482 F. Supp. 376, 391 (N. D. Ill. 1979). But, "information which the government hopes to properly prove at trial" cannot be considered surplusage no matter how prejudicial it may be. *Id.* Thus, a "motion to strike surplusage should be granted only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial. [T]his is a rather exacting standard and only rarely has surplusage been ordered stricken." *United States v. Hernandez*, 2020 WL 291805, at *1 (S.D. Ind. Jan. 21, 2020) (quoting *United States v. Chaverra-Cardona*, 667 F. Supp. 609, 611 (N.D. Ill. 1987)) (alterations in original).

5

## III.
### DISCUSSION

**A. Bill of Particulars**

Mr. Peavler's motion seeks a bill of particulars identifying "(i) the names of unindicted co-conspirators; and (ii) the alleged false or misleading statements alleged to be at issue in the substantive charges of the Indictment." [Filing No. 34 at 1.] In support of his motion, he argues that "a list of co-conspirators is necessary to permit [him] to prepare for trial." [Filing No. 34 at 1.] He notes that the Indictment charges the Defendants with "12 offenses, including conspiracy, securities fraud, wire fraud, bank fraud, and the making of false statement[s]," and that those twelve counts contain forty-five separate references to unnamed and unindicted co-conspirators. [Filing No. 34 at 1.] However, Mr. Peavler contends that "[i]t is not clear whether the government is alleging there were a handful of co-conspirators who took multiple actions or even dozens of separate people." [Filing No. 34 at 5.] He further argues that it is unclear whether the Indictment alleges the existence of a conspiracy with Celadon's employees, the employees of Accounting Firm 1, the employees of Truck Dealer 1, or other individuals. Mr. Peavler details several allegations in the Indictment referencing conduct by unidentified co-conspirators, including that they:

- made false and misleading statements about Celadon's financial condition and business practices;

- knew that the market value for many Celadon-owned trucks . . . had dropped significantly but that Celadon had failed to account for this on the company's accounting records;

- agreed to pursue a series of transactions designed to conceal the fact that many of the trucks on Celadon's accounting records were significantly overvalued;

- intentionally inflated prices on sales invoices;

- caused Celadon to use artificially inflated values on Truck Dealer 1's invoices;

- sought to portray transactions as independent sales and purchases to avoid scrutiny of Accounting Firm 1;

- realized Celadon was in jeopardy of violating its bank covenant;

- caused Celadon to make, on several different occasions, misleading statements in SEC filings to shareholders, banks, auditors, and the investing public;

- made false and misleading statements in December 2016 about the nature of the transactions with Truck Dealer 1;

- concealed a written trade agreement from Accounting Firm 1;

- continued to cause Celadon to provide false and misleading information during the early spring of 2017; and

- made false representations to Accounting Firm 1 in April 2017.

[Filing No. 34 at 6-7 (citing Filing No. 32 at 6-17) (alterations in original) (internal citations and quotations omitted).] Mr. Peavler argues that he must know with whom he is alleged to have conspired before he can show that he did not conspire with them. [Filing No. 34 at 7.] He recognizes that "documents provided in discovery may identify participants in certain events," but he contends that they "will not identify whom the Indictment has identified as co-conspirators." [Filing No. 34 at 7.] Mr. Peavler clarifies that he is not seeking the Government's evidence, but rather only the identities of those with whom he is alleged to have conspired and whom the Government and grand jury believe were knowing participants in the criminal activity. [Filing No. 34 at 9.] Additionally, Mr. Peavler contends that the Indictment alleges that he made "false or misleading statements" on November 9, 2016 (Count 10) and February 10, 2017 (Count 11), but that it does not identify those statements. [Filing No. 34 at 14-15.] He concedes that the Indictment identifies one specific alleged false representation made on November 9, 2016, [see Filing No. 32

at 13], and one specific alleged false representation made on February 10, 2017, [*see* Filing No. 32 at 16], but he argues that the Indictment does not identify the "multiple 'false and misleading statements'" cited in Counts 10 and 11, [Filing No. 34 at 15 (quoting Filing No. 32 at 27)]. He maintains that if the Government intends to argue that there is any other alleged false statement under those Counts, it should be required to file a bill of particulars and identify them specifically. [Filing No. 34 at 14-15.]

The Government responds that "defendants' requested bill of particulars is not necessary" because "defendants have sufficient notice of the nature, purposes, and scope of the charged conspiracy at this stage, as well as their alleged roles." [Filing No. 53 at 1-2.] It contends that "[t]hrough both the detailed Indictment and the significant discovery produced by the Government in this case, the defendants have received more than sufficient notice to understand the nature of the charges against them." [Filing No. 53 at 6.] The Government points out that it has already produced extensive pretrial discovery, in which it identified hundreds of emails, reports, and other documents particularly relevant to the charges, and has also taken steps to produce its discovery in a searchable and indexed database. [Filing No. 53 at 10.] Additionally, it has separately produced a subset of documents referenced in the Indictment and a subset of documents identified "as being among the most relevant documents to the government's investigation." [Filing No. 53 at 10.] The Government assures that it will also "submit a *Santiago* proffer of co-conspirator evidence, which will contain more particulars than a bill of particulars would entail." [Filing No. 53 at 12.] With respect to Counts 10 and 11, the Government argues that the motion "is nothing more than a thinly veiled attempt to have the government make a detailed disclosure of the evidence" it plans to produce at trial and is "not an appropriate basis for seeking a bill of particulars." [Filing No. 53 at 13-14 (quoting *United States v. Holzendorf*, 576 F. App'x 932, 935-

8

36 (11th Cir. 2014)).] The Government argues that it has produced to Defendants both the November 9, 2016 letter and February 10, 2017 letter, and that all of the alleged false statements referenced in Counts 10 and 11 are contained within those letters.

Mr. Peavler replies that the "Indictment makes broad, open-ended conspiracy allegations" and refers to co-conspirators in forty-five separate allegations. [Filing No. 54 at 4.] He argues that Celadon was a large corporation with a substantial number of officers and employees, and there were several third parties (such as truck vendors, lawyers, and outside auditors) involved in some way with the transactions at issue in this case. [Filing No. 54 at 4.] Mr. Peavler acknowledges that discovery will include documents containing the names of individuals who were involved with the transactions at issue. [Filing No. 54 at 8.] However, he contends that those documents will not identify individuals that the Government and grand jury believe knowingly entered into the conspiracies, nor will it specify which of the alleged conspiracies those individuals joined. Mr. Peavler's attorneys maintain that without the bill of particulars, they "will waste considerable time and resources chasing evidence about individuals who are not alleged to have joined any of the five alleged conspiracies." [Filing No. 54 at 9.] Similarly, Mr. Peavler argues that the Government's *Santiago* proffer will be inadequate because it will identify "only those individuals whose statements the government will attempt to introduce as evidence," but will not identify the individuals alleged to have been co-conspirators. [Filing No. 54 at 10.] Last, regarding the false and misleading statements that form the bases for Counts 10 and 11, Mr. Peavler replies that the documents in which the false statements were alleged to have been made "are complex documents containing substantial amounts of information." [Filing No. 54 at 13.] He maintains that his request for the statements the Government alleges to be false "is a very narrow and targeted

9

request," and without that information, he will be left "guessing as to the specifics of the government's allegations against [Defendants]." [Filing No. 54 at 14-15.]

In exercising its discretion, the Court finds that a bill of particulars is appropriate in this case. District courts in this circuit have held that "[t]he names of unindicted co-conspirators are a proper subject of a bill of particulars." *United States v. Colonia*, 1987 WL 15994, at \*2 (N.D. Ill. Aug. 11, 1987). In determining whether to order a bill of particulars identifying the names of unindicted co-conspirators, other courts have considered several factors, including: "(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation." *United States v. Nachamie*, 91 F. Supp. 2d 565, 572-73 (S.D.N.Y. 2000) (adding that "[i]f there are a large number of co-conspirators and a long-running conspiracy, a defendant is more likely to be surprised by the identity of the co-conspirators whom he may never have met," and that "if the discovery has been voluminous, identification of known unindicted co-conspirators will help a defendant focus his investigation and prepare for trial"); *see also United States v. Michel*, 2019 WL 5797669, at \*17-18 (D.D.C. Nov. 6, 2019) (ordering a bill of particulars identifying unindicted co-conspirators where the scope of the conspiracy charged and voluminous discovery demonstrated the difficulty the defendant would encounter in investigating the charges, building a defense, and avoiding unfair surprise at trial).

In this case, these factors weigh in favor of a bill of particulars. First, the Indictment does not clearly define the bounds and scope of the conspiracy it alleges. Though it does identify a relatively short timeframe—"in or around at least June 2016, through in or around at least April

2017"—it does not clearly outline the scope in other respects. The Indictment does not allege the number of co-conspirators, nor the degree of their involvement. That is, Mr. Peavler does not know whether he is alleged to have conspired with dozens of people, or with only a handful. Moreover, the nature of the allegations is such that simply learning the names of the individuals in some way involved with the relevant events will not aid Mr. Peavler in knowing those with whom he is alleged to have conspired. Indeed, it is not at all clear whether all of the co-conspirators are contained within Celadon's leadership and/or Celadon's employment, or whether the list of co-conspirators includes other individuals. As just one example, the scheme alleged here involved transactions with Truck Dealer 1, but the Indictment does not allege whether or to what degree Truck Dealer 1's management or employees were co-conspirators in Defendants' scheme, or whether they were in the dark on the alleged criminal conduct.

Additionally, the Government has produced a substantial volume of discovery—consisting of more than 6.4 million pages of documents. [Filing No. 54 at 7.] This amount of discovery (as well as the content) weighs in favor of the bill of particulars. *See Michel*, 2019 WL 5797669, at *18 (finding that the amount and contents of the more than 35,000 documents produced in discovery weighed in favor of granting the motion for a bill of particulars) (citing *United States v. Concord Mgmt. & Consulting LLC*, 385 F. Supp. 3d 69, 75 (D.D.C. 2019) (finding the same)). *Cf. United States v. Carman*, 2004 WL 1699019, at *2 (N.D. Ill. 2004) ("10,000 pages [of discovery] are not so voluminous to necessitate a bill of particulars, especially in a case where [defendants] have a lengthy period to review the information prior to trial and where the indictment sufficiently apprises [defendants] of the charges against them."). Though the Government produced its discovery in a searchable and indexed database, Defendants must know for whom (or what) they should search before those tools become useful. Those tools might allow Defendants to determine

11

which individuals are mentioned or named most frequently in those documents, but that information does not enable them to determine with whom they are alleged to have conspired. Moreover, it is highly likely that a considerable number of individuals will be named in those documents, further complicating Defendants' efforts to determine with whom the Government and grand jury believe they conspired. *See Michel*, 2019 WL 5797669, at *18 (noting that a substantial amount of discovery with a lengthy list of names "demonstrates the large number of people who could potentially be considered unindicted co-conspirators by the government").

Last, there is no danger to the co-conspirators if the motion is granted, nor is there potential harm to the Government's investigation. As Defendants note, this is a white-collar case, and none of the events described in the Indictment involve any sort of violence or threats of violence. [*See* Filing No. 34 at 8.] Furthermore, nothing in the Government's response indicates that its investigation would be hindered in some way if it were required to disclose the identities of the co-conspirators.

As to the alleged false statements at issue in Counts 10 and 11, the Government has explained that all of the false statements that form the bases of those counts are contained within the two management representation letters referenced in the Indictment, and that the Government has produced those letters in full in its discovery. But, Mr. Peavler should not have to "waste pre-trial preparation time guessing which statements he has to defend against . . . when the government knows precisely the statements on which it intends to rely." *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998) (noting that the Government's contention that through due diligence, the defendant can identify "what part of the related information constitute[s] the actual false statement" is "inconsistent with the presumption of innocence"); *see also United States v. Risk*, 672 F. Supp. 346, 360 (S.D. Ind. 1987) (ordering the Government to file a bill of particulars disclosing "the

specific portions, segments, or sentences of the bank report that are alleged to be and that the government intends to prove are false").  Therefore, a bill of particulars identifying the alleged false or misleading statements at issue in Counts 10 and 11 is appropriate.

### B. Request to Strike "Among Other Things"

In his motion, Mr. Peavler argues that the Court should "strike the phrase 'among other things'" from Counts 5, 7, 8, and 12.[5] [Filing No. 34 at 1 (quoting Filing No. 32 at 21-27).]  Mr. Peavler asserts that "there is a long history of courts striking ['among other things'] as improper surplusage." [Filing No. 34 at 10 (citing several cases).]  He argues that this Court should do the same because the Indictment's use of "among other things" "leaves open the possibility that [the Government] will make other allegations about other statements . . . that the grand jury rejected or never considered as a ground for a criminal charge." [Filing No. 34 at 12.]  Mr. Peavler notes that each of Counts 5, 7, and 8 concern allegedly false or misleading statements or information made in various documents: a submission to a bank on November 14, 2016 (Count 5), and SEC Form 10-Q for the fiscal quarters ending on September 30, 2016 (Count 7), and December 31, 2016 (Count 8).  [Filing No. 34 at 12-13.]  He argues that although the Indictment articulates discrete examples of false or misleading statements made in each of those submissions, it also includes the phrase "among other things," which "leaves open the possibility that the government could try to prove some other allegedly false statement as the basis for [those Counts] without any assurance that the grand jury agreed to base the charges on such statements." [Filing No. 34 at 13.]  Mr. Peavler argues that Count 12 alleges that Defendants "made false statements on April 5, 2017 'to Accounting Firm 1 concerning, *among other things* …,'" [Filing No. 34 at 12 (quoting Filing No.

---

[5] The phrase "among other things" is used directly in Counts 5 and 12, and it is incorporated by reference into Counts 7 and 8.  [Filing No. 34 at 10.]

32 at 26) (emphasis original)], and that, as with the other charges, the Government could use "among other things" to expand the charges beyond what the grand jury considered. Therefore, Mr. Peavler requests that the Court strike as surplusage "among other things" from the Indictment.

The Government responds that "among other things" is not surplusage; instead, it "describes discrete instances of false and misleading statements." [Filing No. 53 at 15 (capitalization altered).] It argues that each use of the term is found within the description of a specific event: "the filings of an SEC Form 10-Q containing false and misleading information about Celadon ([incorporated by reference into Counts 7 and 8]); the submission of a certification to one of Celadon's banks signed by Peavler and bearing false and misleading financial information ([Count 5]); and an in-person meeting with Celadon's independent auditors ([Count 12])." [Filing No. 53 at 16.] According to the Government, "[e]ach appearance of the term 'among other things' is cabined within that discrete event and only indicates that specific quotations and summarizations of statements found within the Indictment are exemplars of the false and misleading statements that occurred in those documents or conversations." [Filing No. 53 at 16.] The Government argues that it is not required to identify every misrepresentation it intends to show at trial and that it would be difficult to do so in a case like this. [Filing No. 53 at 16.] The Government concludes that "among other things" "serves to inform the defendants that certain identified false statements . . . are illustrative and not the totality of the false statements in the documents and conversations described" in the Indictment. [Filing No. 53 at 16-17.]

Mr. Peavler replies that the Government ignores his constitutional arguments that "among other things" violates the Fifth Amendment by "impermissibly broaden[ing] the Indictment beyond what the Grand Jury may have considered." [Filing No. 54 at 11.] By failing to respond, he argues, the Government waived its opposition to those arguments. Separate from the Government's failure

to respond, Mr. Peavler argues that only the grand jury can amend the Indictment to broaden it, and that the Government violates the Fifth Amendment when it broadens the bases for conviction beyond those presented to the grand jury. [Filing No. 54 at 12 (quoting *United States v. Haldorson*, 941 F.3d 284, 296-97 (7th Cir. 2019)).] He concludes that "'among other things' has no substantive meaning and can only be used in furtherance of a potential Fifth Amendment violation, [and] it should be stricken from the indictment." [Filing No. 54 at 12.]

The Court finds that "among other things" should be stricken from the Indictment. As both sides point out, the documents in which the allegedly false and misleading information was disclosed are lengthy and technical. [Filing No. 53 at 16; Filing No. 54 at 13.] Thus, there exists a greater risk that the jury might misapprehend the charges or information. Allowing "among other things" could lead the jury to speculate that the Defendants are guilty of or responsible for actions not charged in the Indictment. *See United States v. Menendez*, 137 F. Supp. 3d 688, 707 (D.N.J. 2015) (quoting *United States v. Poindexter*, 725 F. Supp. 13, 35 (D.D.C. 1989)). The Fifth Amendment protects criminal defendants from being "held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." Though "the government is not required to identify 'every single material misrepresentation [it] intend[s] to show at trial,'" [Filing No. 53 at 16 (quoting *United States v. Holzendorf*, 576 F. App'x 932, 935-36 (11th Cir. 2014))], to permit "among other things" to remain in the Indictment "would constitute an impermissible delegation of authority to the prosecution to enlarge the charges contained in the indictment. *United States v. Pope*, 189 F. Supp. 12, 26 (S.D.N.Y. 1960). The Court therefore orders "among other things" stricken from the Indictment.

### IV.
### MOTION TO JOIN

In his motion, Mr. Meek argues that Mr. Peavler's motion identifies several deficiencies in the Indictment, and that that the deficiencies apply just as strongly to him. [Filing No. 39 at 1.] Therefore, he requests that any relief granted to Mr. Peavler also be granted to Mr. Meek. [Filing No. 39 at 1.] The Court agrees, and therefore grants Mr. Meek's Motion, [39], and he is entitled to the same relief described above.

### V.
### CONCLUSION

Consistent with the foregoing, the Court **GRANTS** Mr. Meek's Motion for Joinder, [39], and Mr. Peavler's Motion for a Bill of Particulars and to Strike the Phrase "Among Other Things" As Surplusage, [34]. The Court **ORDERS** the Government to file a bill of particulars identifying the unnamed co-conspirators in connection with all Counts and specifying the alleged false or misleading statements at issue in Counts 10 and 11. The Government shall file its bill of particulars on or before **May 31, 2020**. Additionally, "among other things" is **stricken** from Counts 5 and 12 and as it is incorporated by the Indictment into the charges in Counts 7 and 8, [*see* Filing No. 34 at 1], and the Government shall submit an Amended Indictment[6] so reflecting on or before **May 31, 2020**.

---

[6] A Superseding Indictment is not necessary; an Amended Indictment is sufficient.

Date: 5/7/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**