UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:19-cr-00378-JMS-MJD |
| | ) | |
| WILLIAM ERIC MEEK and | ) | -01 |
| BOBBY LEE PEAVLER, | ) | -02 |
| | ) | |
| Defendants. | | |

**INDICTMENT**

The Grand Jury charges that:

**INTRODUCTION**

At all times relevant to this Indictment:

**Relevant Entities and Individuals**

1.     Celadon Group, Inc. ("Celadon") was a truckload shipping company headquartered in Indianapolis, Indiana.   Starting in or around November 2009, Celadon's stock was traded publicly on the New York Stock Exchange ("NYSE"), a national securities exchange, and was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934.   In Fiscal Year 2016, Celadon reported more than $1 billion in revenue, and approximately $24.8 million in net income.

2.     Quality Companies ("Quality") was a division, or "business unit," of Celadon also headquartered in Indianapolis, Indiana.   Quality owned trucks, which it leased to truck drivers who contracted directly with Quality or through other companies. By in or around June 2016,

Quality had thousands of trucks under management. Quality's financial information was included in Celadon's accounting records and in Celadon's disclosures to the investing public because Quality was a business unit of Celadon.

3.   **WILLIAM ERIC MEEK** was Celadon's President and Chief Operating Officer ("COO").   **MEEK** had significant responsibility for Celadon's trucking operations, as well as the operations of its Quality division.   At times, **MEEK** also spoke directly to shareholders of Celadon stock about the company's performance.

4.   **BOBBY LEE PEAVLER** was Celadon's Chief Financial Officer ("CFO").   As CFO, **PEAVLER** was responsible for overseeing Celadon's accounting records, and for signing and certifying Celadon's financial statements released to the investing public.   At times, **PEAVLER** also spoke directly to shareholders of Celadon stock about the company's performance.

5.   Executive 1 was Celadon's Chief Executive Officer ("CEO").   As CEO, Executive 1 served as the highest-ranking executive within Celadon, and for signing and certifying Celadon's financial statements released to the investing public.   Executive 1 also made public statements to investors and analysts following the performance of Celadon's stock.

6.   Danny Ray Williams was the President of Celadon's Quality division.   Williams reported directly to **MEEK** and had frequent contact with **PEAVLER** and Executive 1. Williams's responsibilities included helping facilitate the sale of Celadon's and Quality's used trucks, particularly when the company wanted to sell a large number of trucks at once or over a short period of time.

7.     Truck Dealer 1 operated a series of truck dealerships across the United States and specialized in buying and selling new and used commercial trucks. Truck Dealer 1 operated a location in Indianapolis, Indiana that did business with Celadon and Quality.

## The United States Securities and Exchange Commission

8.     The SEC was an independent agency of the United States government charged by law with preserving honest and efficient markets in securities. The federal securities laws, regulations, and rules were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public. Securities laws, as well as the SEC's regulations and rules for public companies, required that Celadon and its directors, officers, and employees, among other things, make and keep books, records, and accounts that accurately and fairly reflected the transactions and disposition of the company's assets, and prohibited the knowing and willful falsification of Celadon's books, records, or accounts.

9.     Celadon was required to file annual reports (SEC Forms 10-K) and quarterly reports (SEC Forms 10-Q) with the SEC, which contained financial statements that accurately and fairly presented the financial condition of Celadon, as well as other reports that contained information about Celadon's management, Board of Directors, business operations, and performance. Through these reports, Celadon disclosed its financial information to Celadon's shareholders, independent auditors, regulators, lenders, and the investing public.  In addition to Celadon's reports filed with the SEC, Celadon also disclosed its financial information to shareholders through press releases, earnings calls, and earnings announcements.

10.     As CFO of Celadon, **PEAVLER** signed certifications regarding SEC Forms 10-K and SEC Forms 10-Q attesting that, among other things, "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary

to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." **PEAVLER** also certified that "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant [Celadon] as of, and for, the periods presented in this report." **PEAVLER** also certified that he and Executive 1 were "responsible for establishing and maintaining disclosure controls and procedures" designed "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared." **PEAVLER** also certified that he had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Celadon's] internal control over financial reporting."

## Celadon's Auditors

11.    An independent auditor is a certified public accountant who examines the financial statements that a company's management has prepared. Federal securities laws, regulations, and rules required that an independent auditor examine and report on the financial information that Celadon provided to the SEC and the investing public.

12.    Accounting Firm 1, with offices in Indianapolis, Indiana, and elsewhere, acted as the independent auditor of Celadon's financial statements.

13.    Accounting Firm 1 relied on **MEEK**, **PEAVLER**, and other Celadon employees to provide truthful and accurate information about Celadon's finances and transactions, including those involving Quality, in order for Accounting Firm 1 to perform the services that are required by the SEC.   Accounting Firm 1 obtained information from **MEEK**, **PEAVLER**, and other

Celadon employees through phone calls, meetings, emails, and signed letters from management (referred to as "management representation letters") purporting to represent to Accounting Firm 1 that certain facts were true.

## Celadon's Lenders

14.     For all periods relevant to this Indictment, Celadon financed many operations using a revolving line of credit of approximately $300 million.   Celadon received this line of credit from a collection of U.S. banks, which included Bank 1.   Bank 1 was a federally insured depository institution with branches throughout the United States.   Celadon borrowed money from Bank 1 and other banks pursuant to a credit agreement to finance operations and acquisitions.

15.     As part of the agreement between Celadon and the banks, Celadon agreed to follow certain terms designed to limit the risk borne by the banks.   These terms were known as "bank covenants."   Every quarter, an executive from Celadon, such as **PEAVLER**, was required to report certain financial figures to the bank to show it remained in compliance with the covenants. Additionally, every quarter Celadon reported to its shareholders, through its required SEC filings, whether it was in compliance with its bank covenants.

16.     One of the bank covenants limited the amount of total debt that Celadon could take on relative to its earnings (the "debt-to-earnings ratio").   This limit on the debt-to-earnings ratio was designed to help protect the banks by limiting the total amount of debt Celadon could take on. The debt-to-earnings ratio also was an important metric to investors.

## THE CONSPIRACY AND SCHEME TO DEFRAUD

### Overview and Purpose of the Conspiracy and Scheme

17.     From in or around at least June 2016, through in or around at least April 2017, **MEEK**, **PEAVLER**, Williams, and Executive 1 at Celadon agreed to: (a) defraud Celadon's shareholders, banks, and the investing public; (b) falsify Celadon's accounting records in order to hide losses incurred by the company; (c) conceal from shareholders, banks, and the investing public that Celadon was in violation of at least one bank covenant governing its lending arrangements; and (d) mislead Celadon's independent auditors and regulators, including individuals at Accounting Firm 1.

18.     The purpose of the conspiracy and scheme was for **MEEK**, **PEAVLER**, Williams, and Executive 1 to: (a) conceal Celadon's true financial condition from Celadon's shareholders, banks, the investing public, independent auditors, and regulators; and (b) unjustly enrich themselves through their continued receipt of compensation and other benefits.

19.     As described below, **MEEK**, **PEAVLER**, Williams, and Executive 1 used and agreed to use a combination of methods to carry out their scheme, including but not limited to making and causing others to make false and misleading statements about Celadon's financial condition and business practices.

### Description of the Conspiracy and Scheme

#### *Celadon Suffered Millions of Dollars' Worth of Losses*

20.     From approximately 2013 to 2016, Celadon expanded its Quality truck leasing business.   During that time, the number of trucks owned by Quality increased from approximately 750 to more than 11,000.

21.     By approximately 2016, the value of many of Celadon's trucks—particularly those owned through Quality—had dropped because, among other things, a drop in the used truck market.    Additionally, hundreds of Celadon-owned trucks—including hundreds owned through Quality—were "inactive" (i.e., unleased and unused) and generating no revenue.

22.     Celadon's truck inventory (including the fleet owned through Quality) also included hundreds of a specific model of truck—the 2012 International ProStar with MaxxForce engine ("2012 ProStar")—which had a significant mechanical issue that reduced the truck's value and depressed Quality's ability to find drivers willing to lease or use the truck.

23.     By in or around mid-2016, **MEEK**, **PEAVLER**, Williams, and Executive 1 knew that the market value for many Celadon-owned trucks—including many owned through Quality— had dropped significantly but that Celadon had failed to account for this on the company's accounting records.    For example:

   a.     In or around May 2016, **MEEK**, **PEAVLER**, Executive 1, Williams, and other Celadon employees discussed possible ways to improve demand for the 2012 ProStars.    During the exchange, Williams informed **MEEK**, **PEAVLER**, Executive 1, and others that he estimated the market value for the 2012 ProStars owned by Quality at $15,000, due to significantly depressed demand.    At the time, Celadon's accounting records listed the value of its 2012 ProStars at up to $60,000.

   b.     In or around June 2016, **MEEK** wrote Williams in an email that Celadon "really need[ed] to sell the $70M or so of excess," referring to trucks that Celadon had listed in its own accounting records as being worth $70 million.    Williams responded to **MEEK**, "We aren't in the money on hardly any of the $70M," meaning they had

overvalued the trucks and would suffer losses if the trucks were sold for their fair market value.

        c.      On or about August 4, 2016, **MEEK** emailed Executive 1 and Williams a classified advertisement from an unrelated third party, which offered to sell multiple 2012 ProStars at approximately $15,500 apiece.   **MEEK** wrote in the email "[a] good example of what the market is on this," referring to the prices for 2012 ProStars.

24.     By failing to account for the decline in truck values, **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to conceal tens of millions of dollars in losses to its shareholders, banks, and the investing public when reporting its financial results.

### *The Conspirators Traded Trucks with Truck Dealer 1 to Hide Losses*

25.     Rather than writing down trucks to their fair market value and reporting the losses on its accounting records, **MEEK**, **PEAVLER**, Williams, and Executive 1 agreed to pursue a series of transactions designed to continue to conceal the fact that many of the trucks on its accounting records were significantly overvalued.   **MEEK**, **PEAVLER**, Williams, Executive 1, and others referred to these transactions as "trades."   The scheme involved Celadon's Quality division trading away hundreds of its older and less desirable trucks (including 2012 ProStars) to Truck Dealer 1 in exchange for used (but generally newer) trucks owned by Truck Dealer 1.

26.     In order to continue to hide losses, **MEEK**, **PEAVLER**, Williams, and Executive 1 intentionally inflated the prices on sales invoices to continue to conceal the fact Celadon's trucks were worth significantly less than reported to investors.   The negotiation of the trades generally occurred in the following manner:

        a.      Williams, at **MEEK**'s direction, contacted Truck Dealer 1 about trading trucks.   Williams then provided Truck Dealer 1 with a list of trucks Celadon, through

Quality, wanted to dispose of, along with the values listed in Celadon's accounting records (the "book value") for those trucks. These book values generally were well in excess of market value but represented the amount that Celadon needed to receive for each truck to avoid reporting the previously undisclosed losses.

b.  After using the list to select which Celadon trucks it wanted to receive, Truck Dealer 1 would calculate how much the book value for those trucks exceeded fair market value. Truck Dealer 1 referred to this total figure as the "over allowance."

c.  To complete the trade without reducing their own truck prices to market value, **MEEK**, **PEAVLER**, Williams, and Executive 1 agreed to buy trucks from Truck Dealer 1 at a price equal to the trucks' market value plus the total amount by which the Celadon truck prices were overinflated. Truck Dealer 1 would then complete invoices for Quality with prices inflated by the amount of the "over allowance" calculated for that trade.

d.  As a result, Celadon and Truck Dealer 1 inflated the prices on both sides of the trade by approximately the same amount, allowing Celadon to dispose of trucks while hiding its losses.

27.  When Celadon recorded the values of the used trucks it purchased from Truck Dealer 1, **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to use the artificially inflated values on Truck Dealer 1's invoices. Had Celadon recorded the trucks purchased from Truck Dealer 1 at their true fair market values, Celadon's disclosures to shareholders and the investing public would have revealed that the company's financial condition was in fact substantially worse than it otherwise represented.

28.  In total, **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon (through Quality) to engage in four artificially inflated trade transactions with Truck Dealer 1 between

approximately June 2016 and September 2016. Altogether, they traded approximately 1,000 trucks to Truck Dealer 1 at inflated prices and received over 600 trucks in return, resulting in the concealment of tens of millions of dollars in losses from shareholders, banks, and the investing public.

29.     Although they were actually trades—where Truck Dealer 1 only agreed to take Quality trucks if Quality took trucks in return—**MEEK**, **PEAVLER**, Williams, and Executive 1 subsequently sought to portray the transactions as Quality and Truck Dealer 1 independently "purchasing" and "selling" trucks, with each sale being independent of a corresponding purchase. **MEEK**, **PEAVLER**, Williams, and Executive 1 did so in order to avoid heightened scrutiny of the transactions by Accounting Firm 1, and to deceive others into believing the invoiced prices involved in these transactions reflected the market value of the trucks in question.

### *Using the Fourth Trade Transaction to Mislead Banks and Investors about Celadon's Financial Condition for the Quarter Ending September 30, 2016*

30.     As described above, Celadon financed many of its operations using a revolving line of credit, which Celadon received from a collection of banks, including Bank 1. In or around September 2016, **MEEK**, **PEAVLER**, and their co-conspirators recognized that Celadon was in jeopardy of violating the bank covenant that limited its debt-to-earnings ratio. In response, **MEEK**, **PEAVLER**, and their co-conspirators designed a scheme to use the fourth trade transaction with Truck Dealer 1 to conceal this information from banks and the investing public in Celadon's financial reports for the quarter ending on September 30, 2016. Like the other trades, each side's trucks would be invoiced at inflated prices. Unlike the other trades, however, the payments would be staggered. Specifically, **MEEK**, **PEAVLER**, and their co-conspirators sought to, and did, convince Truck Dealer 1 to pay Celadon approximately $25 million just before

September 30, 2016, with the secret and unreported agreement that Celadon would pay a similar amount of money back to Truck Dealer 1 shortly after that date.

31.     In or around September 2016, **PEAVLER** and Williams spoke with executives from Truck Dealer 1 about staggering the payments associated with the fourth trade transaction so that they occurred on either side of September 30, 2016.  Truck Dealer 1 executives informed **PEAVLER**, **MEEK**, and Williams that, in order for Truck Dealer 1 to pay tens of millions of dollars to Celadon prior to September 30, 2016, they required a written agreement setting forth Celadon's obligation to pay tens of millions of dollars back to Truck Dealer 1 after September 30, 2016.  **PEAVLER**, **MEEK**, and Williams agreed to Truck Dealer 1's demand and negotiated the language of the written agreement with Truck Dealer 1, which **MEEK** and Williams signed on behalf of Celadon and Quality (the "September Trade Agreement").

32.     In negotiating the September Trade Agreement, **PEAVLER** emailed Williams requesting that certain language be altered because the proposed language "makes it feel more like a trade" and **PEAVLER** did not "want to sound any alarms."  The language flagged by **PEAVLER** was subsequently removed, but the fundamental terms of the transaction remained the same.  **MEEK**, **PEAVLER**, Williams, and Executive 1 knew the transactions were part of a single trade and referred to such transactions with Truck Dealer 1 as "trades" in internal communications.

33.     After **MEEK** and Williams signed the September Trade Agreement, the deal was executed as contemplated by the parties:

    a.     On or about September 29, 2016, Celadon sent a wire transfer of approximately $5.9 million to Truck Dealer 1 ("Payment 1"), which **MEEK**, **PEAVLER**,

and Williams caused Celadon to record on its accounting records as a standalone payment by Celadon for 50 trucks owned by Truck Dealer 1.

b.      Also on or about September 29, 2016, after Payment 1 was completed, Truck Dealer 1 sent a wire transfer of approximately $30.9 million to Celadon ("Payment 2"), which **MEEK**, **PEAVLER**, and Williams caused Celadon to record on its accounting records as a standalone payment by Truck Dealer 1 for 508 trucks owned by Celadon. Celadon immediately used the proceeds from Payment 2 to pay down part of its debt owed to Bank 1 and other banks before the close of the quarter ending September 30, 2016.

c.      On or about October 3, 2016, Celadon sent a wire transfer of approximately $27.9 million to Truck Dealer 1 ("Payment 3"), which **MEEK**, **PEAVLER**, and Williams caused Celadon to record on its accounting records as a standalone payment by Celadon for 225 trucks owned by Truck Dealer 1.

***False and Misleading Financial Information Reported for the September 2016 Quarter***

34.      As described above, Celadon was required to report truthfully and accurately on its financial condition to shareholders, banks, auditors, and the investing public on a quarterly basis. To effectuate their scheme to defraud, **MEEK**, **PEAVLER**, Williams, and Executive 1 caused the company to report false and misleading information to shareholders, banks, auditors, and the investing public about Celadon's financial condition for the quarter ending on September 30, 2016 ("September quarter").

35.      On or about November 9, 2016, **PEAVLER** and Executive 1 signed a management representation letter addressed to Accounting Firm 1 for the September quarter. In the letter, **PEAVLER** falsely certified to Accounting Firm 1 that Celadon had made available to Accounting Firm 1 "[a]ll financial records and related data" and "[a]ll significant contracts," as well as

"disclosed any significant unusual transactions the Company has entered into during the period, including the nature, terms and business purpose of those transactions."

     a.    However, as **PEAVLER**, **MEEK**, Williams, and Executive 1 knew, Celadon had not informed Accounting Firm 1 that the four trades with Truck Dealer 1 were in fact trades and that the invoices associated with each transaction had been falsely inflated to conceal that the value of Celadon's trucks had dropped significantly. **PEAVLER**, **MEEK**, Williams, and Executive 1 knew that Celadon's transactions with Truck Dealer 1 would receive greater scrutiny if Accounting Firm 1 knew these transactions were a series of trades involving the swapping of used trucks for other used trucks. In order to avoid such scrutiny—and in order to continue to hide unreported losses—**PEAVLER**, **MEEK**, Williams, and Executive 1 hid from Accounting Firm 1 the fact that these transactions were trades, indicating falsely that the units had been acquired and sold in unconnected transactions.

     b.    Additionally, as **PEAVLER**, **MEEK**, Williams, and Executive 1 knew, Celadon had concealed from Accounting Firm 1 the written September Trade Agreement and the fact that, as of quarter-end on September 30, 2016, Celadon was obligated to pay approximately $27 million to Truck Dealer 1 on or about October 3, 2016 in exchange for having received approximately $25 million net on September 29, 2016.

36.    On or about November 9, 2016, **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to file false and misleading information in a SEC Form 10-Q for the September quarter. The conspirators caused the following false and misleading information to be disclosed:

     a.    **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to overstate its financial health by continuing to hide tens of millions of dollars in losses

suffered by declining truck prices and other factors, which the conspirators continued to hide by using inflated truck prices during the four trade transactions with Truck Dealer 1.

      b.     **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to report figures that included the approximately $25 million net that Celadon had received from Truck Dealer 1 on or about September 29, 2016, but omitted any reference to or accounting for the September Trade Agreement and the $27 million that Celadon was obligated to pay (and did pay) to Truck Dealer 1 under the agreement.

      c.     **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to report that it was in compliance with all of its bank covenants, when in fact Celadon had exceeded the debt-to-earnings ratio permitted under its bank covenants with Bank 1.

37.    On or about November 14, 2016, **PEAVLER** signed and submitted to Bank 1 a compliance certificate in conjunction with Bank 1's line of credit containing false and misleading information about Celadon's debt-to-earnings ratio. **PEAVLER** certified in the compliance certificate to Bank 1 that he made a "detailed review" of Celadon's transactions during the quarter and that the "financial covenant analyses and information . . . are true and accurate." However, as **PEAVLER** well knew, the debt-to-earnings ratio that Celadon reported to Bank 1 included the approximately $25 million net that Celadon had received from Truck Dealer 1 on or about September 29, 2016, but omitted any reference to or accounting for the $27 million Celadon had agreed to pay back to Truck Dealer 1 on October 3, 2016 under the September Trade Agreement.

***Additional False and Misleading Statements to Accounting Firm 1 and Investors***

38.    On or about December 8, 2016, an investing website published an article alleging, in part, that Celadon had engaged in "a large tractor swap" with Truck Dealer 1 but "did not properly account for this swap in its financial statements." This allegation prompted renewed

scrutiny from Accounting Firm 1 about Quality's transactions with Truck Dealer 1 that had occurred since June 2016. Accounting Firm 1 asked Celadon to provide additional information about any agreements (written or oral) between Celadon (through its Quality division) and Truck Dealer 1, as well as the terms involved in the exchange of trucks between the two companies.

39.    In response to the article and increased questioning from Accounting Firm 1, **MEEK**, **PEAVLER**, Williams, and Executive 1 continued to make false and misleading statements, and caused other Celadon employees to make false and misleading statements, to Accounting Firm 1 and investors about the nature of the transactions involving Truck Dealer 1. Specifically, **MEEK**, **PEAVLER**, Williams, and Executive 1 falsely denied that the transactions were trades, instead claiming the purchases and sales of trucks were negotiated independently. **MEEK**, **PEAVLER**, Williams, and Executive 1 also concealed terms of these trades, including the terms laid out in the written September Trade Agreement signed by **MEEK** and Williams and negotiated by **PEAVLER**. Finally, **MEEK**, **PEAVLER**, Williams, and Executive 1 also falsely claimed that the trucks involved in the transactions were purchased and sold at fair market value, and thus were accounted for properly on Celadon's accounting records. In truth, the invoiced prices for the trucks exchanged with Truck Dealer 1 were significantly inflated over market value, in order for Celadon to conceal losses it had suffered as a result of falling truck prices and other factors.

40.    On or about February 10, 2017, **PEAVLER** signed a management representation letter addressed to Accounting Firm 1 that contained the following false representation:

> The [Truck Dealer 1] sales and purchases transactions were conducted at arm's length and the prices at which the Company [Celadon] bought and sold vehicles reflect fair market values at the time of the transactions. Each transaction was discreet in nature and none were interdependent. There are no undisclosed side agreements related to these transactions.

**PEAVLER** knew this representation was false at the time he signed the representation letter. At the time **PEAVLER** signed the management representation letter, **MEEK**, **PEAVLER**, Williams, and Executive 1 continued to conceal, among other things, the written September Trade Agreement from Accounting Firm 1.

41. On or about February 10, 2017, **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to file false and misleading information in a SEC Form 10-Q for the quarter ending on December 31, 2016. The conspirators caused the following false and misleading information to be disclosed:

      a. **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to overstate its financial health by tens of millions of dollars by using inflated truck prices for the trucks that Celadon had acquired from Truck Dealer 1.

      b. **PEAVLER**, as CFO, certified that he had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." In fact, **PEAVLER** had not disclosed that he had made false and misleading representations to Accounting Firm 1 about the transactions involving Truck Dealer 1, including in his management representation letter dated February 10, 2017.

42. During the early spring of 2017, Accounting Firm 1 continued its investigation and continued to ask Celadon's management to provide details of the transactions with Truck Dealer 1. **MEEK**, **PEAVLER**, Williams, and Executive 1 continued to cause Celadon to provide false and misleading information about how the deals with Truck Dealer 1 were negotiated and the terms of those deals. Additionally, **MEEK**, **PEAVLER**, Williams, and Executive 1 caused Celadon to provide false and misleading responses about the appropriateness of the prices assigned to the

trucks exchanged with Truck Dealer 1, in order to conceal the fact that Celadon had failed to report millions of dollars in losses.

43.     During Accounting Firm 1's investigation into the trades involving Truck Dealer 1, **PEAVLER** encouraged Williams to delete certain emails in order to avoid Accounting Firm 1 locating those emails.   Williams agreed and deleted certain emails while **PEAVLER** was in Williams's office.

44.     In connection with its investigation, Accounting Firm 1 held a series of meetings with Celadon's senior management, including a meeting on or about April 5, 2017.   This meeting was attended by **MEEK**, **PEAVLER**, and other Celadon executives.   At the April 5, 2017 meeting, **MEEK**, **PEAVLER**, and their co-conspirators falsely represented to Accounting Firm 1, among other things, that: (a) the transactions with Truck Dealer 1 were not trades; and (b) the transactions were done at fair market value.

45.     On or about April 23, 2017, Accounting Firm 1 for the first time received from Celadon the written September Trade Agreement signed by **MEEK** and negotiated by **PEAVLER** and Williams.   Shortly thereafter, Accounting Firm 1 informed Celadon that it was withdrawing its audit report for Celadon's Fiscal Year 2016 financial statements and its review reports of Celadon's financial statements for quarters ending September 30, 2016 and December 31, 2016.

46.     On or about May 1, 2017, Celadon publicly announced that its financial statements issued for fiscal year 2016 (which ended on June 30, 2016), the quarter ending September 30, 2016, and the quarter ending December 31, 2016 should no longer be relied upon, as well as the related reports of Accounting Firm 1 for those three reporting periods.   This announcement resulted in an approximate one-day loss in Celadon's market value of $62.3 million.

## COUNT 1
### Conspiracy to Commit Wire Fraud, Bank Fraud, and Securities Fraud
### (18 U.S.C. § 1349)

47.     Paragraphs 1 through 46 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

48.     From at least in or around June 2016 through at least in or around April 2017, in the Southern District of Indiana and elsewhere, defendants

**WILLIAM ERIC MEEK** and
**BOBBY LEE PEAVLER**,

did knowingly and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, and agree with other individuals known and unknown, to commit certain offenses, namely:

a.     wire fraud, that is, to knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343;

b.     bank fraud, that is, to knowingly and willfully, and with the intent to defraud one or more financial institutions, to wit: Bank 1, and to obtain moneys, funds, and credits owned by and under the control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344; and

c.     securities fraud, that is, to knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Celadon, an issuer with a class of

18

securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Celadon, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), in violation of Title 18, United States Code, Section 1348.

## Purpose

49.     The Grand Jury realleges and incorporates by reference paragraphs 17 through 19 of this Indictment as a description of the purpose of the conspiracy.

## Manner and Means

50.     The Grand Jury realleges and incorporates by reference paragraphs 1 through 16 and 20 through 46 of this Indictment as a description of the manner and means of the conspiracy.

All of which is in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 THROUGH 6
### Wire Fraud
### (18 U.S.C. §§ 1343 and 2)

51.    Paragraphs 1 through 46 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

52.    From at least in or around June 2016 through at least in or around April 2017, in the Southern District of Indiana, and elsewhere, defendants

**WILLIAM ERIC MEEK** and
**BOBBY LEE PEAVLER**,

and others known and unknown to the Grand Jury, on or about the dates specified as to each count below, did knowingly, willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice.

### Purpose

53.    The Grand Jury realleges and incorporates by reference paragraphs 17 through 19 of this Indictment as a description of the purpose of the scheme and artifice.

### Manner and Means

54.    The Grand Jury realleges and incorporates by reference paragraphs 1 through 16 and 20 through 46 of this Indictment as a description of the manner and means of the scheme and artifice.

### Use of the Wires

55.    On or about the dates specified as to each count below, **WILLIAM ERIC MEEK** and **BOBBY LEE PEAVLER**, in the Southern District of Indiana and elsewhere, for the purpose

of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce for the purposes of executing such scheme and artifice, as set forth below:

| Count | Approximate Date | Description of Interstate Wire |
|:---:|:---:|:---|
| 2 | September 29, 2016 | Email from Williams to Truck Dealer 1 employees containing September Trade Agreement signed by **MEEK** and Williams, as well as two Quality invoices to Truck Dealer 1. |
| 3 | October 3, 2016 | Wire transfer of approximately $27,913,500 from Celadon to Truck Dealer 1. |
| 4 | November 9, 2016 | Email from Celadon employee to Accounting Firm 1 transmitting management representation letter signed by **PEAVLER** and Executive 1. |
| 5 | November 14, 2016 | Submission to Bank 1 of "Form of Compliance Certificate," signed by **PEAVLER**, bearing false and misleading information about Celadon's debt-to-earnings ratio. |
| 6 | February 10, 2017 | Email from Celadon employee to Accounting Firm 1 transmitting management representation letter signed by **PEAVLER** and Executive 1. |

Each count of which is a separate violation of Title 18, United States Code, Sections 1343 and 2.

**COUNTS 7 AND 8**
**Securities Fraud**
**(18 U.S.C. §§ 1348 and 2)**

56.     Paragraphs 1 through 46 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

57.     From at least in or around June 2016 through at least in or around April 2017, in the Southern District of Indiana and elsewhere, defendants

**WILLIAM ERIC MEEK** and
**BOBBY LEE PEAVLER**,

and others known and unknown to the Grand Jury, on or about the dates specified as to each count below did knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Celadon, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Celadon, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*).

Purpose

58.     The Grand Jury realleges and incorporates by reference paragraphs 17 through 19 of this Indictment as a description of the purpose of the scheme and artifice.

Manner and Means

59.     The Grand Jury realleges and incorporates by reference paragraphs 1 through 16 and 20 through 46 of this Indictment as a description of the manner and means of the scheme and artifice.

<u>False and Misleading Representations to Investors</u>

60.    On or about the dates specified as to each count below, **MEEK** and **PEAVLER** made, and caused to be made, false and misleading representations to Celadon's shareholders and the investing public about Celadon's financial condition.

| Count | Approximate Date | Description |
|---|---|---|
| **7** | November 9, 2016 | SEC Form 10-Q for fiscal quarter ending on September 30, 2016. |
| **8** | February 10, 2017 | SEC Form 10-Q for fiscal quarter ending on December 31, 2016. |

Each count of which is a separate violation of Title 18, United States Code, Sections 1348 and 2.

**<u>COUNT 9</u>**
**Conspiracy to Make False Statements to a Public Company's Accountants and to Falsify Books, Records, and Accounts of a Public Company**
**(18 U.S.C. § 371)**

61.    Paragraphs 1 through 46 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

62.    From at least in or around June 2016 through at least in or around April 2017, within the Southern District of Indiana and elsewhere, defendants

**WILLIAM ERIC MEEK** and
**BOBBY LEE PEAVLER**,

did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to:

a.    knowingly and willfully, directly and indirectly: (1) make and cause to be made materially false or misleading statements to Accounting Firm 1, and omit to state,

and cause another person to omit to state, any material fact to Accounting Firm 1 necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, and (2) take action to coerce, manipulate, mislead, and fraudulently influence Accounting Firm 1 knowing that such action, if successful, could result in rendering Celadon's financial statements materially misleading, in connection with Accounting Firm 1's review of Celadon's financial statements and preparation of Celadon's quarterly and annual reports required to be filed with the SEC, in violation of Title l5, United States Code, Section 78ff, and Title 17, Code of Federal Regulations, Sections 240.13b2-2(a) and 240.13b2-2(b); and

b. knowingly and willfully falsify, and cause to be falsified, books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of Celadon, in violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff, and Title l7, Code of Federal Regulations, Sections 240.13b2-1.

Purpose

63. The Grand Jury realleges and incorporates by reference paragraphs 17 through 19 of this Indictment as a description of the purpose of the conspiracy.

Manner and Means

64. The Grand Jury realleges and incorporates by reference paragraphs 1 through 16 and 20 through 46 of this Indictment as a description of the manner and means of the conspiracy.

Overt Acts

65.     In furtherance of the conspiracy and to achieve its unlawful purpose, at least one of the conspirators committed and caused to be committed, in the Southern District of Indiana, and elsewhere, the following overt acts, among others:

    a.      On or about June 27, 2016, Williams wrote in an email to **MEEK**, "We aren't in the money on hardly any of the $70M," meaning Celadon had overvalued the Quality trucks and would suffer losses if they were sold.    **MEEK** responded to Williams that he would think of a plan for the trucks.

    b.      On or about September 28, 2016, **PEAVLER** wrote an email to Williams directing him to change certain terms in the September Trade Agreement in order to hide the fact that the purchase and sale of trucks was being done as part of a trade.

    c.      On or about September 29, 2016, Williams emailed Truck Dealer 1 a copy of the September Trade Agreement signed by **MEEK** and Williams.    In the same email, Williams also sent Truck Dealer 1 two invoices that totaled approximately $30,467,504.38 for trucks Quality intended to trade to Truck Dealer 1.

    d.      On or about November 9, 2016, **PEAVLER** and Executive 1 signed a management representation letter addressed to Accounting Firm 1 for the quarter ending September 30, 2016.    In the letter, **PEAVLER** falsely certified to Accounting Firm 1 that Celadon had made available to Accounting Firm 1 "[a]ll financial records and related data" and "[a]ll significant contracts," as well as "disclosed any significant unusual transactions the Company has entered into during the period, including the nature, terms and business purpose of those transactions."

e.     On or about February 10, 2017, **PEAVLER** signed a management representation letter addressed to Accounting Firm 1 that contained the following false representation:

> The [Truck Dealer 1] sales and purchases transactions were conducted at arm's length and the prices at which the Company [Celadon] bought and sold vehicles reflect fair market values at the time of the transactions. Each transaction was discreet in nature and none were interdependent. There are no undisclosed side agreements related to these transactions.

f.     On or about April 5, 2017, **MEEK**, **PEAVLER**, and other co-conspirators met with members of Accounting Firm 1, during which they falsely represented to Accounting Firm 1, among other things, that: (a) the transactions with Truck Dealer 1 were not trades; and (b) the transactions were done at fair market value.

All of which is a violation of Title 18, United States Code, Section 371.

## COUNTS 10 THROUGH 12
**Make False Statements to a Public Company's Accountants**
**(15 U.S.C. § 78ff; 17 C.F.R. §§ 240.13b2-2(a), 240.13b2-2(b); 18 U.S.C. § 2)**

66.     Paragraphs 1 through 46 and 61 through 65 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

67.     From at least in or around June 2016 through in or around April 2017, within the Southern District of Indiana and elsewhere, defendants

**WILLIAM ERIC MEEK** and
**BOBBY LEE PEAVLER**,

and others known and unknown to the Grand Jury, and on or about the dates specified as to each count below, did knowingly and willfully, directly and indirectly: (1) make and cause to be made materially false or misleading statements to Accounting Firm 1, and omit to state, and cause another person to omit to state, any material fact to Accounting Firm 1 necessary in order to make

statements made, in light of the circumstances under which such statements were made, not misleading, and (2) take action to coerce, manipulate, mislead, and fraudulently influence Accounting Firm 1 knowing that such action, if successful, could result in rendering Celadon's financial statements materially misleading, in connection with Accounting Firm 1's review of Celadon's financial statements and preparation of Celadon's quarterly and annual reports required to be filed with the SEC.

| Count | Defendant(s) | Approximate Date | Description of Act |
|---|---|---|---|
| **10** | **BOBBY LEE PEAVLER** | November 9, 2016 | Management representation letter signed by **PEAVLER** and others and addressed to Accounting Firm 1 containing false and misleading statements. |
| **11** | **BOBBY LEE PEAVLER** | February 10, 2017 | Management representation letter signed by **PEAVLER** and others and addressed to Accounting Firm 1 containing false and misleading statements. |
| **12** | **WILLIAM ERIC MEEK BOBBY LEE PEAVLER** | April 5, 2017 | False and misleading statements by **MEEK** and **PEAVLER** to Accounting Firm 1 concerning the nature of the transactions entered into with Truck Dealer 1 and the appropriateness of the values assigned to the trucks involved in those transactions. |

Each count of which is a separate violation of Title 15 United States Code, Section 78ff; Title 17, Code of Federal Regulations, Sections 240.13b2-2(a) & (b); and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

68.     The allegations contained in Counts 1 through 8 of this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2) and Title 28, United States Code, Section 2461(c).

69.     Upon conviction of a violation of the offenses in violation of Title 18, United States Code, Sections 1343, 1348, and 1349 set forth in Counts 1 through 8 of this Indictment,

**WILLIAM ERIC MEEK** and
**BOBBY LEE PEAVLER**,

the Defendants herein, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

70.     If any of the property described above, as a result of any act or omission of the Defendants:

   a.     cannot be located upon the exercise of due diligence;

   b.     has been transferred or sold to, or deposited with, a third party;

   c.     has been placed beyond the jurisdiction of the court;

   d.     has been substantially diminished in value; or

   e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

71.     In keeping with the foregoing, it is the intent of the United States to seek forfeiture of any other property of the Defendants up to the value of all forfeitable property as described above.

All of which is pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982, and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

JOSH J. MINKLER
United States Attorney
Southern District of Indiana

ROBERT A. ZINK
Chief, Fraud Section
Criminal Division
United States Department of Justice

By:  Steven D. DeBrota
Deputy Chief
Nicholas J. Linder
Assistant United States Attorney

By:  Kyle W. Maurer
Trial Attorney
L. Rush Atkinson
Assistant Chief